# UNITED STATES OF AMERICA
# DEPARTMENT OF LABOR
# OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

## SUBPOENA DUCES TECUM

**TO:**  *Amazon, Inc. – DYO1  or Custodian of Record*
*500 Hudson Valley Avenue*
*New Windsor, New York 12553*

*Pursuant to Section 8(b) of the Occupational Safety and Health Act [29 U.S.C.§657(b)] you are hereby required to appear before Rita Young, Area Director of the OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, UNITED STATES DEPARTMENT OF LABOR, at the Albany Area OSHA office, 401 New Karner Road, Albany, NY 12205, on the 16th day of  August, 2022 at  10 a.m., of that day, to testify regarding the working conditions maintained by:*

*Amazon, Inc. – DYO1*
*500 Hudson Valley Avenue*
*New Windsor, New York 12553*

*and you are hereby required to bring with you and produce at said time and place the following documents, including information stored electronically:*

*See attached document requests and instructions.*

*FAIL NOT AT YOUR PERIL*



*IN TESTIMONY WHEREOF I have hereunto affixed my signature and the seal of the UNITED STATES DEPARTMENT OF LABOR AT OSHA ALBANY AREA OFFICE this 2nd DAY of AUGUST.*

**RITA YOUNG, MS**
**AREA DIRECTOR,**
**OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION,**
**UNITED STATES DEPARTMENT OF LABOR**

*RETURN OF SERVICE*

*I hereby certify that a duplicate original or the within subpoena was duly served:*
*(Indicate by check method used)*

*{ __} in person,*
*{ __} by leaving at principal office,*
*{ __} or place of business,*
*to wit*

*on the person named herein on*

_____
*(Month, day, year)*

_____
*(Name of person making service)*

_____
*(Official title)*

*~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~*
*I certify that the person named herein was in attendance as a witness at:*

_____

*on*_____
*(Month, day or days, year)*

_____
*(Name of person certifying)*

_____
*(Official title)*

**SUBPOENA ATTACHMENT – DOCUMENTS TO BE PRODUCED**

*You are hereby required to bring with you and produce at said time and place the following books, papers and documents, including information stored electronically:*

## DEFINITIONS

1.  "Amazon" refers to Amazon.com, Inc.; Amazon.com Services LLC; Amazon, Inc.; Amazon.com Corporate LLC; Amazon.com LLC; Amazon.com.azdc LLC; Amazon.com.dedc LLC; Amazon.com.indc LLC; Amazon.com.ksdc LLC; Amazon.com.kydc LLC; Amazon.com.nvdc LLC; and Prime Now LLC, as well as to any predecessor, successor, corporate parent, subsidiary, or affiliate of any of these entities and to any officer, employee, agent, representative, or person acting or purporting to act on behalf of any such entity or on behalf of any predecessor, successor, corporate parent, subsidiary, or affiliate.

2.  "AmCare Medical Consultant" means a medical provider who AmCare staff consult or seek advice from concerning specific injuries or illnesses, including any nurses on-demand.

3.  "AmCare" means the first-aid center located within the Facility.

4.  "And" and "or" both mean "and/or."

5.  "Any" and "all" both mean "any and all."

6.  "Austin" means the electronic system referred to as "Austin" that Amazon uses, among other things, to enter information concerning Worker injuries and illnesses.

7.  "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

8.  "Complaints" means any information raising actual or potential issue or concerns.

9.  "Concerning" means relating to, referring to, describing, evidencing, or constituting.

10. "Documents" means without limitation any item described by Federal Rule of Civil Procedure 34, and any written, printed, typed, graphic, photographed, and recorded or otherwise reproduced or stored communication or representation, including but not limited to letters, memoranda, correspondences, e-mails, and canceled checks.  This term includes whatever form and by whatever means such documents may have been created or stored including, but not limited to: any handmade form, such as writing; any photographic form, such as microfilm, microfiche, prints, slides, negatives, photocopies; any mechanical form such as printing, or typing; any electrical, electronic, or magnetic form such as tape recordings, cassettes, or any information on an electronic or magnetic storage device such as floppy diskettes, hard disks, backup tapes, CD-ROMS, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, hard drives, or electronic notebooks; and any printout or readout from any magnetic storage device.  All

documents provided in response to this Subpoena are to include all marginalia and post-its, as well as any attachments referred to in or incorporated by the documents.  All documents provided in response to this Subpoena are to include all versions of each responsive document, including all drafts and copies of each document.

11.    "Facility" means the Amazon warehouse at 500 Hudson Valley Avenue, New Windsor, New York 12553.

12.    "Gensuite" means the electronic system referred to as "Gensuite" that Amazon previously used, among other things, to enter information concerning Worker injuries and illnesses.

13.    "H&S Responsible Person" means each Amazon employee, executive, or officer whose responsibilities included (in whole or in part) health and safety at the Facility or an aggregate of Amazon facilities including the Facility during the Relevant Period.

14.    "H&S Management Chain" means each H&S Responsible Person, as well as those who supervise, oversee, or manage an Amazon employee or executive in this Management Chain.

15.    "Including" means "including, but not limited to."

16.    "Injury Rate" means a rate at which Workers in an Amazon facility become injured or ill, whether calculated according to all injuries or illnesses, only those injuries or illnesses that require job restriction or days off work, or in some other fashion.

17.    "Key Productivity Metrics" mean, for each shift in an Amazon facility, the number, distribution by size, and distribution by weight of boxes delivered to the Facility; the number, distribution by size, and distribution by weight of boxes shipped out of the Facility; the number of inbound trucks that delivered to the Facility; the number of outbound trucks loaded at the Facility; the number of Workers who worked in each process in the Facility that shift; and any Productivity Requirements or Guidance provided to Workers applicable to that shift.

18.    "Manager" means a Worker who supervised, oversaw, or managed one or more other Workers.

19.    "Outside Medical Provider" means a medical provider, whether an individual, clinic, hospital, or practice, that provides a medical diagnosis or care to an Amazon Worker outside of an Amazon facility.

20.    "Policies, Training, or Guidance" means any formal policy, training, directives, standard operating procedures, or guidance provided by Amazon to Workers (including Managers) at any point during the Relevant Period.

21.    "Productivity Rate" means the rate at which a Worker performed one or more of the tasks assigned to the Worker.

22. "Productivity Requirement or Guidance" means any requirement, expectation, or guidance concerning Productivity Rates.

23. "Relevant Period" means the time period from July 18, 2017, to the present.

24. "Safety Team Members" means Amazon Workers who are designated as part of a facility's safety team.

25. "Sibling Facilities" means other Amazon delivery stations in the United States.

26. "Site Leader Management Chain" means the Amazon employees or executives who supervise, oversee, or manage the Facility's Site Leader, as well as those who supervise, oversee, or manage an Amazon employee or executive in this Management Chain (e.g., the manager of the Site Leader's manager, and that manager's manager).

27. "Site Leader" means the Amazon employee or employees responsible for the overall operations and management of the Facility.

28. "Termination" means a decision made by Amazon that a Worker should cease working at a facility, however Amazon classifies that Worker.

29. "Time Off Task" means the time calculated by Amazon under that heading.

30. "Worker" means anyone who worked at the Facility (or, in a Document Request concerning a Sibling Facility, the Sibling Facility) during the Relevant Period, whether classified by Amazon as an employee, temporary employee, independent contractor, or something else, including delivery drivers who lifted packages in the Facility and Amazon employees assigned to a region, nationwide, or worldwide who performed work at the Facility or Sibling Facility.

31. "Worker Fatality" means a Worker who died at the Facility or a Sibling Facility during the Relevant Period, whether or not Amazon determined the cause of death was work-related.

32. "You" and "your" refer to Amazon.

## __INSTRUCTIONS__

1.    Unless otherwise specified, this Subpoena requires production of all documents or information during the Relevant Period that are responsive to the requests below as relates to the Facility, including documents that apply to multiple Amazon locations and that cover, apply to, or otherwise relate to the Facility, and which are in your possession, custody, or control regardless of where such documents or information are located.  You shall include all documents or information that relate to or used during the Relevant Period even if they had been prepared or published prior.  Further, if any document requested in this Subpoena is no longer in your possession, custody, or control, identify such document completely and provide the following information regarding the document:

    a.    Its present location and custodian;

    b.    The manner in which it was disposed, including the date of disposal, the reason of disposal, the person authorizing the disposal, and the person(s) who disposed of the document.

2.    If no documents exist that are responsive to a request below, you shall include, in your response to this Subpoena and at the time of production, a written statement to that effect.

3.    For any document or part thereof that you decide not to produce by reason of a claim of privilege, you shall state the privilege being claimed, give an explanation for your claim of such privilege, and provide the following information concerning the putatively privileged document:

    a.    The type of document;

    b.    The date of the document;

    c.    The subject matter of the document;

    d.    The author of the document, including his or her address, telephone number, and role in relation to you;

    e.    All recipients of the document, including their addresses, telephone numbers, and roles in relation to you;

    f.    The number of pages of the document.

4.    In responding to this Subpoena, all documents produced shall be segregated and labeled so as to identify which request(s) such documents respond to.  Alternatively, you shall identify, by bates-numbers, the documents responsive to each request herein.

5.    In responding to this Subpoena, you shall locate, gather, and produce documents from your files and other sources in such a manner as to ensure that the source and location of each document may be readily determined.

6.      In responding to this Subpoena, if you locate responsive documents in file folders or other containers, you shall produce these folders and containers, including any labels identifying such folders or containers, together with the responsive documents contained therein.

7.      In responding to this Subpoena, documents attached to each other shall not be separated unless you also identify such separation and provide records sufficient to permit the reconstruction of such grouping of documents.

8.      In responding to this Subpoena, if you locate any document that have markings on both sides, you shall produce both sides of the document.

9.      In responding to this Subpoena, you shall locate, gather, and produce documents or information stored electronically in accordance with the "Document and ESI Production Specifications" accompanying this Subpoena.

10.     In responding to this Subpoena, you shall produce in digital, native format any responsive document or information that is stored electronically.

11.     Your obligation of production in response to this Subpoena is a continuing one. Accordingly, documents or information located at any time after a response is due shall be promptly produced in the manner specified by this Subpoena.

12.     All requests for medical information concerning a Worker are made pursuant to OSHA's Medical Access Order pertaining to the Facility.

## <u>DOCUMENT REQUESTS</u>

1.      Documents sufficient to show the direct or indirect relationship between the entity that directly controls and operates the Facility and Amazon.com, Inc., including any intermediary entities, the ownership of each, any board members of any Amazon entity in this chain who were employed by or served on the board of another Amazon entity during the Relevant Period, and the control exercised by Amazon.com, Inc. on the entity that directly controls and operates the Facility.

2.      Organizational charts sufficient to show the Amazon employees or departments outside of the Facility that supervise, oversee, manage, or otherwise have any responsibility for or control over the Facility or the Facility's Managers.

3.      Documents sufficient to identify each Amazon employee in the Site Leader Management Chain.

4.      Documents sufficient to show, for each Worker:

   a.      that person's name;

   b.      the dates they worked at the Facility, including any breaks in that period;

   c.      the name of the business entity that paid the person for working at the Facility;

   d.      if they were not assigned only to the Facility, the percentage of their work hours (by month) spent at the Facility;

   e.      job title or job titles held and dates each was held; and

   f.      most recent contact information for that person, including phone number, email address, and mailing address.

5.      Documents sufficient to show the reason for Termination of each Worker Terminated by Amazon.

6.      Documents sufficient to show the Key Productivity Metrics for each shift during the Relevant Period.

7.      Descriptions of each job title or process at the Facility.

8.      Documents sufficient to show the operating hours of the Facility.

9.      Documents sufficient to show the schedule of each Worker at the Facility.

10.     Documents sufficient to show performance standards or any criteria by which the performance of employees is evaluated by job title or process.

11.     Documents sufficient to show the Facility's physical layout.

12.   Documents sufficient to show any standards or guidance applicable to the design of Amazon's workstations, including Amazon's Worldwide Design Standards.

13.   Any documents, including Policies, Training, or Guidance, concerning actual or expected Facility productivity or performance, including any Key Productivity Metrics.

14.   Any documents, including Policies, Training, or Guidance, concerning Worker productivity or performance, including a description of what is expected or required and Managers' response to Worker productivity or performance that does not meet those expectations or requirements.

15.   Policies, Training, or Guidance concerning Worker discipline up to and including termination.

16.   Policies, Training, or Guidance concerning mandatory or non-mandatory overtime.

17.   Policies, Training, or Guidance concerning when Workers can leave their stations.

18.   Documents sufficient to show, for each process and each shift, any Productivity Requirements or Guidance provided to Workers for that shift.

19.   Documents sufficient to show the Key Productivity Metrics from the Facility during each shift from July 1, 2022, to July 18, 2022.

20.   Documents sufficient to show the Key Productivity Metrics from the Facility during each shift during the Relevant Period.[1]

21.   Documents sufficient to show the Productivity Rate of each Worker for each shift from July 1, 2022, to July 18, 2022.

22.   Documents sufficient to show the Productivity Rate of each Worker for each shift during the Relevant Period.[2]

23.   Documents sufficient to show the Time Off Task of each Worker for each shift during the Relevant Period.

24.   The documents requested in Document Request Nos. 20, 22, and 23 for each Sibling Facility.

25.   Documents sufficient to show any discipline, warnings, or other feedback provided to each Worker indicating that the Worker's performance was not satisfactory at any time during the Relevant Period due to Productivity Rate or Time Off Task.

26.   Documents sufficient to show the information available to Managers concerning the

---

[1] You need not reproduce documents produced in response to Document Request No. 19.
[2] You need not reproduce documents produced in response to Document Request No. 21.

productivity or performance of Workers they supervise or manage.

27. All documents provided to Managers concerning the productivity or performance of Workers they supervise or manage.

28. All documents, including internal analyses and communications, concerning or reflecting Worker productivity at the Facility or an aggregate of Amazon facilities including this Facility, whether or not they were generated by or shared with Managers in the Facility.

29. All documents, including internal analyses and communications, concerning Worker productivity at a Sibling Facility or an aggregate of Amazon facilities including a Sibling Facility.

30. Documents (including information or data) reflecting the pace or difficulty of one or more Workers' work during the Relevant Period, including data reflecting each Worker's Productivity Rate during each shift and data reflecting the number or weight of items that Worker handled or transported during each shift.

31. Policies, Training, or Guidance concerning what impact, if any, the productivity of Workers supervised, overseen, or managed by a Manager may have on the compensation provided to that Manager or a promotion decision concerning that Manager.

32. Documents reflecting the manner in which the productivity of Workers supervised, overseen, or managed by a Manager at the Facility impacted a promotion decision regarding that Manager.

33. Documents reflecting the manner in which the productivity of a group of Workers supervised, overseen, or managed at the Facility or the performance of the Facility impacted the compensation provided to any Managers.

34. Documents concerning the decision to transition from Gensuite to Austin, including documents sufficient to identify each Amazon employee involved in that decision and the role of each such employee in that decision.

35. Documents sufficient to identify the Amazon employees or consultants who developed Austin, including those who assisted in determining its capabilities or the logic it employs, as well as the role of each such employee or consultant.

36. Documents sufficient to show when Austin was first used in the Facility and each Sibling Facility.

37. Documents concerning or reflecting training provided to Amazon Workers concerning Austin.

38. Documents sufficient to identify the inputs, outputs, and logic of any algorithms coded into Austin that determine or could impact, for a given potential injury or illness:

    a.    whether the potential injury or illness is recorded on the facility's 300 log;

      b.     whether an OSHA Form 301 is generated;

      c.     whether medical care or advice is provided to the Worker; and

      d.     whether that Worker is referred for diagnosis or treatment to an outside medical provider.

39.    Documents sufficient to show any differences in the logic used by Austin as compared with the logic used by Gensuite with respect to the decisions identified in Document Request No. 38.

40.    Documents sufficient to show which Workers (by title) have access to information entered into Austin and which of these Workers can change that data.

41.    Documents sufficient to identify any processes by which information entered into Austin is reviewed, who is involved in each such process (by title), how that review is conducted, and any possible effects or consequences of such review.

42.    Documents sufficient to identify any processes by which the number of injuries or illnesses at the Facility or a related topic (including the number of injuries or illnesses recorded on a 300 log, the number of workers' compensation cases, or the number of Workers on job restriction or medical leave) are reviewed, who is involved in each such process (by title), how that review is conducted, and any possible effects or consequences of such review.

43.    Policies, Training, or Guidance concerning the functioning of AmCare, including:

      a.     protocols, training, or guidance concerning onsite care;

      b.     training for Workers (including Managers) concerning how and when to visit AmCare;

      c.     examination of an injured or ill Worker;

      d.     AmCare staff consulting with, or seeking advice from, an AmCare Medical Consultant;

      e.     AmCare staff suggesting or referring a Worker to see an Outside Medical Provider;

      f.     Amazon's 21-Day Program;

      g.     recording an injury or illness; and

      h.     handling Worker complaints regarding severe or sustained injury, illness, or pain.

44.    Documents sufficient to identify each Worker who worked at AmCare during the Relevant Period, the relevant duty statement for that Worker, that Worker's area of

practice or expertise, and any license or certification relevant to that work.

45.  All documents (including communications) concerning protocols for care provided at AmCare during the Relevant Period, including drafts of such protocols and the approval or rejection of such protocols.

46.  Policies, Training, or Guidance concerning Worker leave, voluntary or involuntary.

47.  All documents concerning any injury or illness reported by a Worker during the Relevant Period, whether or not deemed by Amazon to be work-related.  These documents shall be produced in digital native format, and any PDF copies shall be produced without watermarks, and should include, but are not limited to:

    a.    OSHA 300 logs;

    b.    OSHA 301 reports;

    c.    OSHA 300A reports;

    d.    any reports concerning an accident, injury, or illness, including Initial Report Forms and Initial Report of Injury;

    e.    first-aid logs, daily logs, and triage logs;

    f.    case management notes, including notes or reports of nurses on-demand;

    g.    onsite treatment records;

    h.    offsite treatment records;

    i.    forms or notes concerning work restrictions;

    j.    root cause analysis; and

    k.    documents concerning workers' compensation that reflect any diagnosis, any opinion or determination as to whether the injury or illness was work-related, any treatment recommended or performed, any work restrictions recommended or implemented, and any recommendations concerning the length of work restrictions or medical leave.

48.  For each Worker reassigned due to injury or illness, documents sufficient to show the pre-injury job, the post-injury job, the physical requirements for each job, the applicable work restrictions, and the dates of the reassignment.

49.  Documents sufficient to provide the information requested in Document Request No. 4 for each Worker Fatality.

50.  Any documents concerning a Worker Fatality.

51.   All documents concerning any AmCare Medical Consultant, including:

    a.   contracts with such providers;

    b.   communications with such providers;

    c.   internal communications or documents concerning such providers;

    d.   audits, analyses, or reviews of such providers; and

    e.   information reflecting the actual or estimated performance of such a provider or its effect on, or value to, Amazon, including any analysis of the number of consultations with such a provider as compared with the number of times Workers were referred to an Outside Medical Provider or the number of recordable injuries of these Workers, the cost of workers' compensation claims for Workers for whom consultation was sought with such a provider, or analysis of the cost of such a provider as compared with the cost of an alternative in-house or external provider or service.

52.   Documents concerning any Outside Medical Provider, including:

    a.   contracts with such a provider;

    b.   communication with or about such a provider;

    c.   documents sufficient to identify each Amazon employee who selected such a provider or decided to continue, discontinue, or otherwise change Amazon's relationship with such a provider;

    d.   documents sufficient to identify the Amazon employee or employees who were the point of contact for such providers with Amazon;

    e.   audits, analyses, or reviews of such a provider; and

    f.   information reflecting how often the provider provided care beyond first-aid to Amazon Workers or put Amazon Workers on work restrictions or days away during some period of time within the Relevant Period; and

    g.   information reflecting the actual or estimated performance of such a provider or its effect on, or value to, Amazon of Amazon's relationship with one or more such providers, including any analysis of the number of visits by Amazon Workers to such a provider as compared with the number of recordable injuries of these Workers, the cost of workers' compensation claims for Workers who visited such a provider, or analysis of the cost of such a provider as compared with the cost of an alternative in-house or external provider or service.

53.   All documents, including internal communications, concerning or reflecting Injury Rate

at the Facility (or an aggregate of Amazon facilities including this Facility), whether or not they were generated or shared with Managers in the Facility, including any trend analyses.

54.    Documents sufficient to show the monthly or annual turnover rate for each job process in the Facility.

55.    The documents requested in Document Request Nos. 53 to 54 for each Sibling Facility.

56.    Documents sufficient to show the training, including but not limited to training via KNET, provided to Workers (including members of the safety team) concerning (a) ergonomic hazards or musculoskeletal disorders; (b) properly storing and securing items; (c) proper use of forklifts; and (d) reporting or recording injuries, and to show how often such training has been provided to Workers.

57.    Documents sufficient to show the job descriptions and requirements for Safety Specialists and the Safety Manager in the Facility and each Sibling Facility.

58.    Policies, Training, or Guidance concerning worker safety, including Policies, Training, or Guidance concerning the roles and responsibilities of Safety Team Members; any policy, practice, or program concerning potential ergonomic hazards, musculoskeletal disorders, struck-by hazards, or heat hazards; or any policy or practice intended to avoid, remediate, or reduce potential ergonomic hazards, musculoskeletal disorders, struck-by hazards, or heat hazards, including engineering controls or job rotation.

59.    Documents sufficient (a) to identify each Amazon employee, executive, or officer whose responsibilities included health and safety at the Facility or an aggregate of Amazon facilities including the Facility during the Relevant Period (including regionally, nationwide, or worldwide); (b) to show the scope of such person's responsibilities; (c) to identify each person who directly reported to such an employee, executive, or officer; and (d) to identify each person to whom such an employee, executive, or officer reported.

60.    Communications with Amazon's Vice President of Worldwide Workplace Health & Safety concerning ergonomic hazards, musculoskeletal disorders, pace of work, struck-by hazards, heat hazards, or injury rates at the Facility, a Sibling Facility, or an aggregate of Amazon facilities including the Facility or a Sibling Facility.

61.    Any documents concerning ergonomic hazards, musculoskeletal disorders, pace of work, struck-by hazards, heat hazards, or injury rates at the Facility, a Sibling Facility, or an aggregate of Amazon facilities including the Facility or a Sibling Facility created by or at the request of, or reviewed by, Amazon's Vice President of Worldwide Workplace Health & Safety during the Relevant Period.

62.    All documents (including drafts) concerning potential ergonomic hazards, risk factors for musculoskeletal disorders, pace of work, struck-by hazards, or heat hazards identified in the Facility, including any trend analyses, all Matrix Reports, all Daily Deep Dive emails sent by a Safety Specialist or Safety Manager, and any other ergonomic or safety audits, studies, or analyses.

63.   All documents (including drafts) concerning potential changes to practices or conditions in the Facility to reduce potential ergonomic hazards, risk factors for musculoskeletal disorders, struck-by hazards, or heat hazards, including Austin Action Items and any other such documents (including data entered into any electronic device) created by a Safety Team Member or responding to information from a Safety Team Member.

64.   The documents requested in Document Request Nos. 62 and 63 for Sibling Facilities or an aggregate of Amazon facilities including the Facility or a Sibling Facility.

65.   Documents sufficient to identify each member of any safety, health, or ergonomic committees in the Facility during the Relevant Period, together with the period of time during which that member served on that committee.

66.   Minutes from, and any documents (including presentations) shared or reviewed at, any safety, health, or ergonomic committee meetings in the Facility during the Relevant Period.

67.   Any documents reflecting or concerning an actual or potential ergonomic risk assessment for any work performed in the Facility, a Sibling Facility, or an aggregate of Amazon facilities including this Facility or a Sibling Facility, including any hazard or risk factor identification or screening or job analyses.

68.   Any documents reflecting or concerning Amazon's relationship with any external expert or consultant with experience with ergonomic hazards who received information from Amazon concerning the manner in which Workers work in one or more Amazon facilities, including through any site visits.

69.   Any documents concerning whether a certain Productivity Rate or pace of work for one or more processes in the Facility, Sibling Facility, or an aggregate of Amazon facilities including this Facility or a Sibling Facility creates, contributes to, or exacerbates a risk to Workers of injury or illness.

70.   Any documents reflecting analysis of the profitability or other value to Amazon of a Productivity Rate or pace of work for one or more processes in the Facility, a Sibling Facility, or an aggregate of Amazon facilities including this Facility or a Sibling Facility.

71.   Any documents reflecting analysis of the size of the labor pool available, now or in the future, for the Facility, a Sibling Facility, or an aggregate of Amazon facilities including this Facility or a Sibling Facility.

72.   Any documents generated by a third-party consultant concerning potential ergonomic hazards, risk factors of musculoskeletal disorders, pace of work, struck-by hazards, heat hazards, or Injury Rates in the Facility, a Sibling Facility, or an aggregate of Amazon facilities including this Facility or a Sibling Facility.

73.   Any documents reflecting or concerning any information submitted by Workers at the Facility or a Sibling Facility to Amazon concerning actual or potential safety hazards, including relevant posts to Amazon's Voice of the Associate boards and the results of any

13

surveys conducted in connection with Amazon's Safety Leadership Index initiative.

74. Policies, Training, or Guidance concerning how or to whom Worker injuries or illnesses should be reported at the Facility.

75. Policies, Training, or Guidance concerning the recording of Worker injuries or illness, including Policies Training, or Guidance concerning OSHA 300 logs and OSHA 301 records and specifically how it is determined whether an injury or illness should be recorded on an OSHA 300 log or whether an OSHA 301 record should be created.

76. Policies, Training, or Guidance prohibiting retaliation against Workers who report injuries or make internal or external complaints regarding worker safety.

77. Policies, Training, or Guidance concerning how Managers, Safety Team Members, or AmCare staff should respond to a Worker injury or illness.

78. All documents (including internal communications) concerning a Worker injury or illness not recorded on the OSHA 300 log or for which an OSHA 301 record was not created, including communications regarding the decision not to record that injury or illness.

79. Documents concerning any incentives provided to Workers (including Managers) for shifts or longer periods without reported injuries or illnesses.

80. Any documents concerning or reflecting potential retaliation against Workers who have reported injuries.

81. Documents sufficient to show the terms of any contractual relationship between Amazon and any entity that employs delivery drivers who lift packages in the Facility to load their trucks.

82. Documents sufficient to show any rules, restrictions, requirements, or guidance provided by Amazon to entities that employ delivery drivers who lift packages in the Facility to load their trucks.

83. Documents reflecting or concerning any Complaints from one or more Workers concerning potential ergonomic hazards, risk factors for musculoskeletal disorders, Productivity Rate, pace of work, struck-by hazards, heat hazards, alleged pressure not to report injuries or illnesses, or purported retaliation at the Facility for reporting injuries or illnesses, including discussions of such Complaints or responses to them.

84. Documents reflecting or concerning any Complaints from one or more Workers concerning AmCare at the Facility, including discussions of such Complaints or responses to them.

85. Documents reflecting or concerning any Complaints from one or more Workers concerning Outside Medical Providers, including discussions of such Complaints or responses to them.

86. Documents reflecting or concerning any Complaints from one or more Outside Medical Providers concerning (a) potential ergonomic hazards, risk factors for musculoskeletal

14

disorders, Productivity Rate, pace of work, struck-by hazards, or heat hazards at the Facility; (b) the care provided to injured Workers by AmCare or Outside Medical Providers; (c) the work restrictions or days away imposed on injured Workers.

**Subpoena Rider**
**Document and ESI Production Specifications**

**I.  Electronically Stored Information (ESI)**

a.  Electronically stored information (ESI) should be produced in accordance with these specifications. If compliance with these specifications would cause undue burden, please contact OSHA/counsel to discuss. Please do not vary from these standards without prior approval from OSHA/counsel.

b.  ***All ESI must be produced both in native file format, and in electronically converted TIFF image format including extracted text and load files.***

**II.  Transactional and Database Records**

a.  Transactional records extracted from a database shall be produced in delimited ASCII text data format or in another easily computer-importable non-proprietary file format that does not incur a loss of data. Field headers shall be included for each column of data, and a data dictionary or other explanation of the contents of each column shall be provided.

b.  Images of items associated with transactions, such as checks, shall be produced in graphic data files in a commonly readable, non-proprietary format, such as TIFF or JPEG, with the highest image quality maintained, and named in a manner that uniquely associates them with the relevant transaction record(s).

c.  Where responsive ESI is contained in a complex relational or proprietary database (*e.g.*, Oracle, SAP, SQL, MySQL, QuickBooks) from which records cannot readily be exported without loss of related data, please contact OSHA/counsel to arrange a meet-and-confer. Identify the database type and version number, and provide the database dictionary and user manuals or other documentation sufficient to describe the structure and content of the database. The meet-and-confer will evaluate, for example, production of a backup of the database (*e.g.*, an .SDF file for a SQL implementation), or other alternatives, such as delimited ASCII exports of custom queries.

**III.  Native File Format for ESI**

a.  All documents must be provided in the original file or "native" format in which the document was created.

b.  System and executable files should not be produced unless specifically requested.

c.  Email files must be delivered in their native format (*e.g.*, Outlook .PST or .msg, Lotus .NSF, etc.).

d.  Relevant information stored in database applications (*e.g.*, Oracle, Sybase, or MSSQL) should only be produced after first consulting with OSHA/counsel to determine method and format of delivery.

d.  Files must be copied and produced in such a manner as to preserve all associated document

and file system metadata. See list of required metadata fields below.

f. Note: a PDF file is *not* considered a native file unless the document was initially created as a PDF.

## IV.  Electronically Converted TIFF Format for ESI

a. <u>In addition to the native format</u>, you must also provide an electronically-produced (*i.e.*, not a printed and scanned) TIFF image version, including extracted text and load files, and available metadata, for each document produced in native format.

b. The electronically converted TIFF production must comply with the TIFF Image Production and Cross Reference File Specifications set forth below.

c. The electronically converted TIFF production must be provided in a Concordance .dat load, together with images and the necessary image cross-reference file. *See* the Delivered Fields Specifications below.

## V.  Custodian, ESI Source Location, and Path—Naming Conventions

a. For each document that is produced, the custodian; the ESI source location (*e.g.*, network server, network hard drive, media); and the network or folder path, must be specified in a .dat file.

b. All ESI provided must be broken down in the following folder structure: by custodian, then by data category (*e.g.*, JohnDoe/Mailfiles/datafiles/desktopfiles).

## VI.  Production of Paper Records

a. Paper records should be produced in ASCII delimited format, as detailed below.

   <u>ASCII delimited text file (.dat) format</u>
   i. The first line of the text file must contain the field names.
   ii. In most instances, the StartBates should be the Image Key field unless another field has been designated the key field by the Government.
   iii. The delimiters used should be the default values used by Concordance: comma (ASCII value 20); quote (ASCII value 254); and newline (ASCII value 174).
   iv. Produce a page header indicator in the following format, <<**batesno**>>, on a separate line for every page of OCR.

b. If there will be more than one production, please confirm the database fields and structure remain consistent between data deliveries.

## VII.  Delivered Fields Specifications

The database and load file provided must contain, at minimum, the first and last Bates number for each document, and all applicable OCR text. The .dat file should contain a path to the OCR. The OCR of the documents should be on a document level.

**VIII.   TIFF Image Production and Cross Reference File Specifications**

   a.   Documents should be electronically converted or, if need be, scanned (at 300 dpi) into
        single-page CCITT Group IV TIFF files.  TIFF file names should match the assigned Bates
        number of the underlying document page, should be unique, and sequentially numbered.
        Searchable PDF files will be accepted only after a consultation between the provider and
        USAO technical support staff.  Multi-page TIFF files are strongly discouraged.

   b.   Bates numbers should be electronically "endorsed" onto images.   The file name assigned
        to the image should match the underlying document's Bates number.   Bates numbers
        should be alpha-numeric, with the numeric portion of the stamp being "zero-filled".  As an
        example, as assigned Bates numbered series of documents such as "ABC1", "ABC2",
        "ABC3" would be unacceptable, whereas "ABC000001", "ABC000002", "ABC000003"
        is preferred.

   c.   Images should be placed on delivered media in a master folder named **XIMAGES**.

   d.   Cross-reference File. TIFF files must be accompanied with an image cross-reference file,
        preferably an Opticon .opt file, otherwise an IPRO .lfp file will be acceptable. *See* below.
        This file must associate each Bates number with the corresponding single-page TIFF file
        name and indicate its location on the media provided. The file should contain one line for
        every page in the collection, and must contain the document Bates number and the fully
        qualified path to the image, beginning with the media volume.

Below is a sample for an Opticon .opt file

```
XYZCO_00663941,,D:\Company\Doe Production\AUTO0003\XYZCO_00663941.tif,Y,,,1
XYZCO_00663942,,D:\Company\Doe Production\AUTO0003\XYZCO_00663942.tif,Y,,,1
XYZCO_00663943,,D:\Company\Doe Production\AUTO0003\XYZCO_00663943.tif,Y,,,2
XYZCO_00663944,,D:\Company\Doe Production\AUTO0003\XYZCO_00663944.tif,,,,
XYZCO_00663945,,D:\Company\Doe Production\AUTO0003\XYZCO_00663945.tif,Y,,,1
XYZCO_00663946,,D:\Company\Doe Production\AUTO0003\XYZCO_00663946.tif,Y,,,2
XYZCO_00663947,,D:\Company\Doe Production\AUTO0003\XYZCO_00663947.tif,,,,
```

Below is a sample for an IPRO .lfp file:

```
IM,ABC-000001,D,0,@VOL01;IMG_0000001;ABC-000001.tif;2,0
IM,ABC-000002,,0,@VOL01;IMG_0000001;ABC-000002.tif;2,0
IM,3542-S-000001,D,0,@VOL01;IMG_0000001;3542-S-000001.tif;2,0
IM,3542-S-000002,,0,@VOL01;IMG_0000001;3542-S-000002.tif;2,0
IM,3542-S-000003,,0,@VOL01;IMG_0000001;3542-S-000003.tif;2,0
```

**IX.   Delivery Media**

   a.   All data and image deliveries must be made through a file-sharing site approved by this
        Office (*i.e.* USAfx), thumb drive, or USB 3.0 external hard drive, depending on data
        volume.

**X.  Metadata Fields**

The production should include the following metadata fields:

```
Prodbeg
Prodend
Prodbegattach
Prodendattach
From
To
CC
BCC
Subject
Date sent
Time Sent
Author
Date Created
Time Created
Date last Modified
Time Last Modified
File Name/Document Name
File Extension
Document Type/Record Type
MD5 Hash
Custodian
Page Count
File Size
Original Folder Path
```