THE HONORABLE JOHN C. COUGHENOUR

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

Amazon.com Services, LLC,

  *Petitioner*,

  v.

United States Department of Justice,

  *Respondent*,

  and

Martin J. Walsh, Secretary of the United States Department of Labor,

  *Intervenor*.

**Case No. 2:22-cv-01815-JCC**

**DECLARATION OF MOLLIE C. NICHOLS IN SUPPORT OF PETITIONER'S CROSS MOTION FOR A PROTECTIVE ORDER PERTAINING TO OSHA SUBPOENAS**

**TABLE OF CONTENTS**

A.  **Relevant Experience** ........................................................2

B.  **General Overview of ESI Discovery and Standard Practices**............6

C.  **Working with Contract Reviewers and Vendors**.............................10

D.  **Privilege Review Standard Practices** ...................................14

E.  **Document Production Standard Practices** ........................................16

F.  **Privilege Logging and Redactions Standard Practices** ....................17

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

G.    The Initiation of Amazon's ESI Productions In This Matter Was Faster Than Typical .................................................................................19

H.    Amazon's Review Process Adheres To Standard Practices ...........................22

I.    Amazon's Rate of Review and Production Is Reasonable .............................24

J.    Amazon's Privilege Review Process Is Reasonable And Consistent With Industry Standard Practice.........................................................................28

K.    Conclusion ...........................................................................................29

## DECLARATION OF MOLLIE C. NICHOLS

I, Mollie C. Nichols, declare and state as follows:

1.      I submit this Declaration in support of Amazon's Cross Motion for a Protective Order Pertaining to OSHA Subpoenas.  If called and sworn as a witness, I could and would competently testify to the following facts and opinions.

A.  **Relevant Experience**

1.      I am the Chief Executive Officer of Redgrave Strategic Data Solutions LLC d/b/a Redgrave Data.  Redgrave Data is a legal technology services company that assists lawyers and their clients with complex data issues in legal matters, including the production of documents in litigation and regulatory inquiries.

2.      I received a BA (1983) from the University of Texas at Austin as well as a JD (1986) and LLM in International Law (2002) from the University of Texas School of Law.

3.      I am licensed to practice law in the State of Texas and the District of Columbia.

4.      From 1987 to 1994, I worked as an Assistant United States Attorney in the Western District of Texas, handling civil, quasi-criminal, and criminal matters.

5.      After leaving the United States Attorney's Office, I was a litigator in Austin, Texas in private practice at the law firm Byrd, Davis & Eisenberg from 1994 to 1999.

6.      In 1999, the newly elected Texas Attorney General selected me to be a Special Assistant Attorney General and to establish and run a trial training program for 640 attorneys emphasizing the use of technology in litigation including electronic discovery, case and document management, and courtroom technology. I also oversaw the implementation of an electronic document review software network for the Texas Attorney General's Office and trained lawyers on its use.

7.      In my positions at the U.S. Attorneys' Office, in private practice, and later as a Special Assistant Attorney General, I tried 25 cases in state and federal court as lead counsel.

8.      From 2003 to 2006, I was employed by William & Mary Law School's Courtroom 21 (now Center for Legal & Court Technology), an international demonstration and experimental courtroom technology project that included the world's most technologically advanced trial and appellate courtroom, as its Associate Director for Research and Professional Education.  In this role, I worked with and trained lawyers and judges worldwide on the use of technology in a litigation practice, including creating and leading training programs on electronic discovery and the review and production of Electronically Stored Information ("ESI").

9.      As an Adjunct Professor at William & Mary Law School, I taught Technology-Augmented Trial Advocacy, a Legal Technology seminar, and Digital Discovery & Evidence, one of the first eDiscovery courses taught in the country.  In February 2004, as a result of my expertise with ESI and other digital evidence, I was invited to and participated in a group discussion with the Advisory Committee to the Judicial Conference about yet-to-be published

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

proposed amendments to the Federal Rules of Civil Procedure to incorporate the nuances of ESI. These amendments eventually went into effect December 2006.

10.     From 2006 to 2007, I worked as a consultant with First Advantage Litigation Consulting (now Consilio), a multi-disciplinary services firm specializing in ESI discovery consulting, electronic discovery processing, computer forensic investigation and data recovery.  I advised lawyers, law firms, and multinational corporations on legal strategies in the preservation, collection, and production of ESI during the litigation process.

11.     I then became the Director of eDiscovery and Litigation Services at Goodwin Procter LLP, an AmLaw 50 firm, from 2007 to 2012.  I developed a robust eDiscovery program for the law firm that included 45 eDiscovery attorneys, litigation technology specialists, and other litigation professionals that assisted with the collection, processing, review, and production of documents in civil litigation and regulatory matters.  The program focused on using best practices and the defensibility of the eDiscovery processes used by Firm attorneys.

12.     From 2012 to 2016, I was a partner at Redgrave LLP, a boutique law firm focused on Information Law, addressing challenges that arise at the intersection of law and technology, including eDiscovery, information governance, data privacy, and data security.  I represented Fortune 100 and 200 clients providing advice and counsel regarding the legal complexities of ESI during day-to-day business operations, as well as throughout the litigation process.

13.     From 2016 to 2018, I was a Senior Attorney at Cleary Gottlieb, a leading international law firm with more than 1,200 lawyers in 16 offices located around the world.  At Cleary, I led the firm's Discovery and Litigation Technology group, which included 50 lawyers and 5 litigation technologists who provided innovative eDiscovery services and counsel to the

firm's global clients using advanced technologies and efficient, defensible processes to process, host, review, and produce documents, including ESI. I provided legal advice and counsel to clients on issues regarding cross-border discovery, data privacy, and eDiscovery strategy in litigation and regulatory matters.

14.     After my time at Cleary, I became the Head of Advanced Client Data Solutions at Hogan Lovells US LLP, a position I held from 2018 to 2022. Hogan Lovells is the 9th largest law firm by revenue globally with over 2800 attorneys in 47 offices worldwide. I was responsible for developing the firm's global approach to the analysis of client data and ESI in matters using advanced analytics and machine learning technologies to enhance efficiency and effectiveness through process and project management. I was a part of the Global Business Leadership Team and the firm's Legal Technology Working Group. I was responsible for both the technical staff and Discovery Attorneys who worked on matters involving eDiscovery and was responsible for the business model for providing technology assisted review services to all attorneys in the firm globally. I was also responsible for the global business model to provide technology assisted review services through a managed service provider to all 47 offices and to develop internal bespoke solutions assisting with client data.

15.     I am engaged in thought leadership in eDiscovery, including involvement as a member of The Sedona Conference, Working Group 1, a think-tank of industry professionals and judges to develop guidelines for ESI document retention, review, and production in legal matters. The mission of Working Group 1 is "to develop principles, guidance and best practice recommendations for information governance and electronic discovery in the context of litigation, dispute resolution and investigations."

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

5

16.     I co-authored *The Sedona Conference Commentary on Information Governance*, Second Edition, (April 2019) and regularly speak on issues regarding eDiscovery.  My CV is attached with a list of my presentations.

B. **General Overview of ESI Discovery and Standard Practices**

17.     Discovery of ESI is in some ways similar to traditional paper discovery; however, it presents significant challenges due to the volume of information that must be processed, the duplication of electronic information throughout a client's system, and the variety of formats in which ESI exists.

18.     A related but separate challenge arises for attorneys when reviewing ESI for privileged, trade secret, or otherwise confidential information, and creating a privilege log sufficient to support privilege assertions.  Diligent and careful review is essential not only to avoid a privilege waiver, but also to protect a client's business (e.g., to avoid the inadvertent disclosures of trade secrets or personal identifiable information of employees or customers).

19.     For these reasons, parties required to produce ESI must take a deliberate, detailed approach to collecting, reviewing, and producing ESI.  Below I provide my perspective on why a party's electronic discovery process is rarely swift, the challenges that frequently arise to increase the review time before production, and why the process is almost always iterative.

20.     The ESI review process can only begin after the parties have agreed to a discovery approach, finalized the list of relevant custodians from whom ESI will be collected, and finalized a list of search terms that will be run against the collected ESI, in an effort to narrow the number of documents funneled for review.  First, ESI is collected and uploaded to

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

6

electronic platforms for processing and review.[1]  This processing transforms the ESI into a standardized form that can be searched and reviewed.  It identifies and labels groups of related documents, such as an email and its attachments, as "families" to preserve the relationship.  If any document in a family is responsive to a discovery request, the entire family is typically produced (subject to applicable privileges and other protections, discussed below) to make sure information is not taken out of context.  For example, if an attachment has responsive content, the attachment is produced with its "parent" email.

21.     Depending on the scope of the discovery that the parties have agreed to, the collected ESI may include many different types of documents.  Nowadays, any ESI collection will typically include email, but it also may include lengthy excel spreadsheets, proprietary database content, video files, word processing documents, or chat exchanges on workplace applications like Skype, Jabber, or Slack.[2]  Some of these documents might be very large; not only does this impact the length of time a reviewer might need to read and understand the document, but such documents also might be slow to load on the review platform, adding additional time to the review process, which can be seconds, or even minutes per document.

22.     Once documents have been processed, they are loaded to an electronic document review platform, where they are displayed and can be read by reviewers.  Next to the document is a "coding panel" that contains various fields for reviewers to enter information, or "code,"

---

[1]  Relativity, Everlaw, DISCO, and others provide software platforms.  Counsel can license these platforms and, if they possess the necessary skill and resources, can set up the review themselves.  More often than not, counsel will engage a vendor to not only provide access to a review platform but also manage it and troubleshoot it.  There are numerous vendors providing such services today.

[2]  *See also* Federal Judicial Center, Managing Discovery of Electronic Information, 36 (3d ed. 2017) (describing types of ESI).

DECLARATION OF MOLLIE NICHOLS                           DAVIS WRIGHT TREMAINE LLP
(CASE NO. 2:22-CV-01815-JCC)                                    920 Fifth Ave, Suite 3300
                                                                                    Seattle, WA 98104

7

each document that they review and analyze.  Merits counsel will create, or will work with the provider of the electronic document review platform to create, an appropriate coding panel that meets the needs of the matter.  The options for coding documents vary according to the demands of each review project.  Some review projects only require a few decisions to be made about each document.  For example, a simple review might only require three basic decisions: is the document relevant or not; is it privileged or not; does the document require further review by a more specialized reviewer (e.g., foreign language document, a highly technical document, a challenging privilege call).  In this type of project, a reviewer might only be required to check two boxes on the coding panel before moving on to the next document.

23.     In most matters that I have been involved in, however, the coding panel is much more complex.  Reviewers might need to check boxes to indicate what case a document relates to (e.g., in an MDL or other proceedings where discovery is being coordinated between different cases); what type of privilege or confidentiality designation applies (e.g., attorney-client privilege, work product privilege; confidentiality; trade secret, etc.); what specific document request the document is responsive to; or what litigation topic a document relates to (e.g., duty, breach, causation, damage; piercing the corporate veil; knowledge, retaliation, damages).

24.     The design of the coding panel is intended to capture this necessary information, but it can contribute to the complexity and speed of the review.  For example, if the reviewers are required to scroll through dozens of options in order to check the appropriate boxes, it will considerably slow their progress down because of the increased time it will take the platform to load the panel ("latency") and the additional time required to scroll through all the coding options.  The amount of space on a panel is limited in order to fit on the screen, so often

voluminous options must be identified with shorthand (e.g., "RFP 1," "RFP 2"), and reviewers will then have to refer to a key outside the system for more details.  In addition, having so many options may also increase the error rate because of fatigue, confusion, boredom, or simply "fat finger" mistakes.

25.     The speed at which any given document review project can be completed will also be affected and vary considerably by the complexity of the decisions reviewers must make.

a.  Relevance decisions in some matters can be straightforward (e.g., where the review only requires assessment of whether the communications relate to a specific person, technology, or contract) or can be complicated (e.g., where a review includes dozens of document requests concerning different topics, requiring the reviewers to refer to the document requests or review protocol frequently to determine whether any given communication is relevant).

b.  Similarly, privilege decisions in some matters can be straightforward (e.g., an email clearly sent by outside litigation counsel that plainly provides legal advice to in-house counsel) or can be extremely challenging (e.g., one of a dozen in-house attorneys from the client is copied on the last-in-time email of a long email chain that could potentially represent the presentation of facts requested by the in-house attorney for the ultimate purpose of rendering legal advice, but not all elements of the email chain appear directly related to the effort, and not all recipients of the emails are clearly within or outside the privilege).

26.     For each document, the number and complexity of decisions reviewers must make (and reflect by checking boxes on the review panel), will determine how long it will take to complete the review.

27.     Another decision merits counsel must make is how to assign and present documents to reviewers.  Documents are typically assigned to reviewers in "batches," which are groups of documents separated for review by the same reviewer.  Documents can be grouped or batched in any number of ways, such as by custodian, by date, by email thread, or by subject matter topic ("thematically").

28.     ESI thus provides more flexibility for merits counsel to design an accurate and efficient review than paper discovery.  Well-designed reviews batch documents in ways that maximize context, minimize the number of decisions reviewers need to make per document, and allow reviewers to build expertise.  One particularly powerful technique is thematic batching.  Batching by topic allows reviewers to learn and make decisions about a smaller number of topics in more depth, enabling them to make faster and more accurate decisions.

29.     Batching techniques are not perfect.  For example, a single document could cover multiple topics, as could conversation in a multi-document email thread, making it impossible to keep batches perfectly segregated by topic.  Nonetheless, these techniques are still powerful tools for speeding review.

C.  **Working with Contract Reviewers and Vendors**

30.     Given the volume of ESI that is typically collected for a matter, it frequently is not efficient to utilize merits counsel to perform all of the actual document review.  Law firms

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

therefore might hire contract attorneys or engage vendors to provide first-level reviewers ("1LRs") to review ESI and make initial relevance and privilege decisions.

31.     Although contract attorneys enable document reviews to scale in response to emergent needs, transition is not instantaneous.  Calculating the number of lawyers needed can be challenging based on the number and quality of lawyers available[3] and is difficult to plan in advance.

32.     First, the contract review vendor or staffing agency must assemble a team.  They start by locating review attorneys who are available and have the proper credentials (e.g., bar admittance in the right jurisdiction).  Once attorneys are found, they must clear conflicts for the case.

33.     Once a team is cleared, it is risky not to have enough work to keep them busy. Paying for an entire team to sit idle quickly becomes prohibitively expensive, but asking reviewers to wait to start or to take a break without pay risks losing them from the project entirely.  Skilled reviewers are in demand and have many opportunities at any given time.

34.     Second, before contract reviewers can be assigned any documents to review, best practices and ethical rules[4] require merits counsel to train and supervise these 1LRs.  This is frequently accomplished in part by having merits counsel draft a document review protocol that summarizes the relevant factual allegations and legal theories of the matter, provides the relevant document requests, sets out instructions for determining relevance and privilege, describes

---

[3]   Using too many reviewers can also impact the performance of the review platform by slowing down the speed of documents rendering, which in turn, slows down the speed of the review.

[4]   *See, e.g.*, ABA Model Rule 5.1.

DECLARATION OF MOLLIE NICHOLS                    DAVIS WRIGHT TREMAINE LLP
(CASE NO. 2:22-CV-01815-JCC)                     920 Fifth Ave, Suite 3300
                                                 Seattle, WA 98104

examples of relevant categories of information, and lists individuals who may create privilege or are likely to possess sensitive information.  The document review protocol also typically explains how 1LRs should use the coding panel provided in the review platform to memorialize the results of their analysis, as well as any questions or comments they may have about a particular document.

35.     In addition, attorneys with extensive knowledge of the matter train the 1LRs by discussing the review protocol, answering questions about the protocol, and guiding the team on how to apply it to difficult documents they encounter.  They also review samples of documents coded by the 1LRs to confirm that the 1LRs' coding is accurate.  Such quality control measures are crucial to ensuring that relevant documents are identified, that non-relevant documents are not produced, and that privileged or otherwise protectable information is redacted or withheld entirely, as appropriate. When mistakes are found in quality control, 1LRs should be given feedback and guidance on how to avoid similar mistakes in the future.

36.     Frequently, quality control measures will be more extensive at the beginning of a review project (or whenever new reviewers join the review team) to ensure that the reviewers understand what is expected of them and are exercising sound judgment.  As the review progresses, quality control measures will continue to be performed on a sample of the coded documents, but might be less extensive because the reviewers have demonstrated their understanding of the process and established their ability to code the documents accurately. Typically, the more time that is devoted to training and guiding reviewers at the outset of the review—including time spent on follow-up training and initial and then ongoing guidance as to

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

their quality of review and analysis—the faster the reviewers will learn to code accurately, and the less time will need to be spent on quality control.

37.     Training and quality control review are typically performed by attorneys with greater knowledge about the matter who are often called second level reviewers ("2LRs"). These 2LRs may also have more experience and/or specialized knowledge than the 1LRs.  As a result, there are many fewer attorneys with the knowledge required to perform 2LR, at least at the outset of a project when merits counsel are typically the only ones with the requisite knowledge.  As they train the 1LRs, however, the most accurate can "graduate" to 2LRs.  Merits counsel may also try to find or train 2LRs from other sources, such as co-counsel firms or by bringing more of their own firm's attorneys into the case.  Until enough 1LRs gain the knowledge necessary to be graduated to 2LR or the 2LR pool can otherwise expand, there is a limited pool of 2LRs who can train and perform the quality control review required to conduct a defensible document review.

38.     The importance of training and of the quality control process therefore limits the size of the 1LR team that can be tasked with reviewing the documents.  If there are more 1LR reviewers than the 2LRs can supervise, bottlenecks arise in the review and production process. For the same reason, hiring additional 1LRs will not necessarily result in faster review speeds (at least initially) because the new reviewers must be trained, supervised, and checked, and this usually will require diverting the limited pool of 2LRs or merits counsel to those tasks.  Indeed, onboarding a group of new reviewers may in fact slow down the review process until the new group is fully trained.

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

39.     If a review is large, complex, and/or difficult enough, it may stratify into a third level, in which 2LRs funnel the most difficult documents to the most expert merits counsel, often called third level reviewers ("3LRs").  3LRs are also typically the attorneys who work with custodians when necessary to resolve questions about particular documents.  Although the 2LR pool can almost always expand by graduating 1LRs given enough time, it is often extremely costly and difficult to expand the 3LR pool.

D. **Privilege Review Standard Practices**

40.     An attorney, and those hired by the attorney to aid in the attorney's representation of a client, "should take reasonable steps to safeguard electronically stored information, the disclosure or dissemination of which is subject to privileges, work product protections, privacy obligations, or other legally enforceable restrictions."[5]  Reasonable steps can include using technology to identify potentially privileged documents (e.g., to use electronic search terms to identify whether an attorney is listed on, sent, or received a document); having human reviewers examine documents to determine whether the document is, on its face, privileged; conducting additional diligence and research by reviewing other documents, interviewing the custodian of the document, or consulting with in-house counsel about the document; and, if in federal court, entering into a FRE 502(d) order to preclude waiver of privilege in the event of inadvertent disclosure.

---

[5] Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, Principle 10 (The Sedona Conference Working Group Series June 2007); *see also id.* Comment 10.i ("Counsel have ethical obligations to protect privileged and confidential information").  Federal courts, and the Federal Judicial Center, frequently cite Sedona Conference publications in connection with electronic discovery issues.  *See* Federal Judicial Center, Managing Discovery of Electronic Information (3d ed. 2017) [*hereinafter* "Managing Discovery"] at 46 (listing Sedona Conference publications among resources that judges can use to find additional information and guidance regarding electronic discovery).

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

41.     Different types of documents will warrant different reasonable steps.  For example, if the custodians from whom the information was collected are attorneys, or are known to work with attorneys on legal (as opposed to business) matters, the steps that must be taken to safeguard privileged information may be more stringent than the steps required when reviewing information produced by custodians who have no reason, based on their role, to interact with attorneys or receive legal advice.   In these circumstances, 1LRs may reasonably be instructed to code any document involving an attorney as presumptively privileged, which will route the document to 2LR for further review and analysis.  Alternatively, the documents might be routed past the 2LRs and straight to a specialized privilege review team; this team may not review the documents coded as privileged until later in the document review process.

42.     While privilege review is also performed on paper documents, the volume and nature of ESI increases the risk of inadvertent disclosure of privileged or otherwise protectable information and requires special attention by outside counsel.[6]

43.     As a result, privilege review often is iterative and, therefore, time-consuming.  A 1LR codes the document as privileged but then learns based on a later-reviewed document that

---

[6] Managing Discovery, *supra* at n.4, 36 ("The volume of ESI that must be searched and produced in response to a discovery request can be enormous, and characteristics of certain types of ESI (e.g., embedded data, threads of email communications, and email attachments) also make it difficult to review for privilege and work-product protection. Thus, the risk of inadvertent disclosure of privileged or protected material during production persists even if great care is taken to identify and segregate the material."); *see also id.* at 37 (acknowledging "increased likelihood of inadvertent production of privileged or protected ESI and the increased cost and delay required for effective preproduction review"); *id.* at 38 (recognizing that privilege review of ESI "can be time-consuming and costly" due to the volume and mutability of ESI); *see also* Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, Comment 10.j (The Sedona Conference Working Group Series June 2007) ("Electronic information systems contain significant amounts of ESI that may be subject to trade secret, confidentiality, or privacy considerations. Examples of such information include proprietary business information such as formulas, business methods, sales strategies, marketing and forecasting projections, and customer and employee personal data (e.g., social security and credit card numbers, employee and patient health data, and customer financial records). Privacy rights related to personal data may extend to customers, employees, and non-parties.").

any privilege was waived because the document was shared with a third party. The review team learns that an individual who did not describe herself as an attorney in her email signature in fact was an attorney and she rendered legal advice. Merits counsel learns upon discussion with a custodian that a document that appeared to contain legal advice, but was not associated with an attorney in the collection, in fact was drafted by an attorney. This often requires re-identifying and re-coding other documents affected by the new information.

44.     Privilege review also often creates bottlenecks in the review process. Given the importance of safeguarding privileged information, final privilege determinations are frequently left in the hands of a small, expert group of 3LRs. These attorneys review any documents escalated by 1LR or 2LRs, and also review any document that would be included on a privilege log. It also is not unusual to create a separate review track to analyze any documents that have been slated to be downgraded and produced (i.e., a determination has been made that, while initially marked as privileged, a document is not, in fact, privileged). Given the importance a client may place on safeguarding its privileged and protectable information, the client may demand that highly trusted team members be tasked with final privilege review. In practice, this may mean that a team of 3 to 5 people must review every document coded as privileged by 1LR or 2LR to confirm whether the document is in fact privileged.

E.  **Document Production Standard Practices**

45.     Once documents have been reviewed and coded, and quality control measures performed, the responding party can finally produce relevant, non-privileged documents. In smaller cases, it is practical to wait until the conclusion of the review to produce. But in larger cases, rolling productions are more typical. This allows the requesting party to review

documents as they are produced rather than having to deal with a huge amount of ESI at the end of the discovery period.  While this approach has benefits, it also has drawbacks.  For example, if the producing party makes rolling productions, coding decisions made by reviewers based on incomplete information may need to be revisited, documents may need to be clawed back, or supplemental production may need to be made if documents are downgraded as non-privileged.

46.     When rolling productions are being made, documents that were not marked privileged by 1LRs are often prioritized for further review and production, as they have a greater chance of avoiding the bottlenecks of privilege review.

F.   **Privilege Logging and Redactions Standard Practices**

47.     The party asserting a document is privileged bears the burden of establishing that the elements of privilege are met by describing the nature of the document in a manner that, without revealing protected information, will enable other parties to assess the claim.[7]  This is typically accomplished by producing a privilege log that identifies the creator of the document, the sender and recipient of a communication, the general subject of the document, and the basis for asserting privilege.

48.     Creating privilege logs for large volumes of ESI is more challenging, time-consuming, and costly than creating logs for paper documents.[8]  And the larger the universe of

---

[7] Fed. R. Civ. P. 26(b)(5).

[8] *See* Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, Comment 10.h (The Sedona Conference Working Group Series June 2007)  ("Logging large volumes of withheld ESI is often costly, burdensome, time-consuming, and disproportionate to the needs of the case. In addition, logging ESI such as email strings and attachments is difficult and lacks any uniform standard. Reviewing, redacting, and logging metadata or embedded information similarly can be a significant and undue burden.")

*(Cont'd on next page)*

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

documents being logged, the more burdensome it is to create a privilege log.[9]  For each logged

document, the withholding party must analyze and confirm the applicable privilege which—as

noted above—often includes custodial interviews with the relevant witnesses.  The withholding

party must also analyze whether the privilege was waived; then, the withholding party must draft

descriptions sufficient to satisfy the responding party without disclosing the substance of the

privileged information.  These descriptions are often reviewed multiple times to ensure that they

meet both objectives.

49.     Because of the time and resources required to create a privilege log, it is typical

for parties to agree to exchange privilege logs 30 days after the completion of all document

productions in the case.

50.     It is also typical that, as a result of the privilege logging process, certain

documents are "downgraded" as non-privileged by more experienced or knowledgeable

reviewers during the course of privilege log diligence.  These supplemental productions are

normal.

51.     Due to the nature of ESI, redacting privileged portions of an otherwise non-

privileged document also becomes more time-consuming.  For example, an email chain may

include ten separate emails where the first is a communication from an attorney providing legal

advice (must be redacted), the second email forwards the legal advice with a non-substantive

commentary (must not be redacted), the third paraphrases the legal advice (must be redacted),

---

[9] *See* Fed. R. Civ. P. 26(b)(5)(A) advisory committee notes to 1993 amendments ("Details concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories").

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

and the fourth through tenth reference parts of the legal advice relevant to otherwise business-related matters (must redact only those portions that reference the legal advice).  Depending on how the documents were initially processed, portions of the same email chain might appear multiple times in a production and need to be redacted identically.  This in turn requires more intensive quality control efforts to ensure consistency.

### G. The Initiation of Amazon's ESI Productions In This Matter Was Faster Than Typical

52.     Based on my review of the subpoenas the government has served and the briefing, including exhibits, filed in this matter, I understand the facts underlying this dispute to be as follows:

53.     OSHA first served Amazon with six document subpoenas – one for each facility at which OSHA opened an inspection.  Each of those subpoenas contains between 86 and 88 document requests.

54.     In addition to OSHA's subpoenas, the U.S. Attorney's Office for the Southern District of New York ("SDNY") served a document subpoena on Amazon, demanding documents responsive to another thirty document requests.

55.     Taken together, there are 118 (88 plus 30) unique document requests (regardless of facility) across these subpoenas.  In my experience, this is a very large number of unique document requests, which significantly increases the complexity of the review process at all levels of review.  Each reviewer must make 118 separate determinations as to whether each document is or is not responsive before moving on to the next document.

56.     I understand from reviewing the subpoenas that these 118 requests also cover a wide variety of different subject matter, which adds even further complexity and difficulty to the review process.

57.     Amazon agreed with the government to collect and search the ESI of a set list of 12 custodians chosen by the government.  These custodians are primarily high level corporate executives with Vice President or Director level titles, who hold worldwide and/or nationwide responsibilities, and are just a couple of levels removed from Amazon's CEO.

58.     The government proposed 19 different search strings.  And, after some negotiation and narrowing of the terms, the government refused to further narrow the search terms.  The resulting 19 searches resulted in the identification of approximately 234,000 documents.  118,259 of these documents hit on at least one of the government's required search strings.  The remaining documents are attachments or cover emails/chats—the so-called "families"—of the documents that the search terms identified.

59.     The search strings were agreed to on November 17, 2022.   I understand that Amazon first produced ESI documents from its review on December 10.  This is faster than typical for a review of this size and complexity.

60.     Even in situations where time is of the essence, the time period between the initiation of an ESI review of this size, complexity due to the number of requests, and sensitivity and the first production of responsive documents from that review is typically several weeks and may be as long as several months.  This time is an essential part of the review process for training reviewers, providing feedback to reviewers, and conducting quality control of reviewers' initial analysis.  As detailed above, the more time devoted to these efforts on the front end, the faster and more efficient the overall ESI review process will be.

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

61.     Here, I understand from correspondence in the briefing record that the government demanded Amazon produce documents for a subset of custodians by December 2— within two weeks of the start of Amazon's review.  In my experience, this demand is not realistic and is not consistent with a sound ESI review process.

62.     I understand that the government demanded Amazon complete its entire ESI review and produce all responsive ESI by January 6, 2023—seven weeks (including the Thanksgiving and year-end holidays) after the parties had agreed to search terms and Amazon could start its review.  In my experience, this demand is not realistic and was not feasible.  If those demands could have been met at all, it could only have been with a rushed ESI process that ignored standard industry practices and significantly increased the likelihood that Amazon's privileged information was inadvertently produced.

63.     I also understand from correspondence in the briefing record that the government demanded Amazon conduct its ESI review by custodian, with the order dictated by the government's proposed deposition schedule.  I understand Amazon requested to conduct its review thematically.  As discussed above, Amazon's requested approach is a common practice that often leads to a faster and more efficient ESI review.  And, in my experience, that could especially have been the case here given the large volume of document requests at issue.  Amazon's thematic approach would have allowed reviewers not only to develop expertise with respect to the terms of art and issues raised by the documents, but also to learn which of the 118 subpoena requests were most likely applicable to the topic they were reviewing.

64.     The government's custodian by custodian approach based on deposition schedule is significantly less efficient.  Reviewers are more likely to encounter documents relating to disparate topics, such as recordkeeping and the remediation of ergonomic hazards.  They are also

more likely to be robbed of relevant context or depth of knowledge about each topic because multiple custodians typically have documents for any given topic.  In short, the government's custodian approach unnecessarily requires reviewers to learn about and make judgment calls about more subjects at once, with less information about each subject.

65.     Although review by custodian is a common compromise to accommodate deposition schedules, it typically arises much later in a review, when at least some documents have been produced and reviewers have already been trained and have had a chance to develop expertise.  At that point, switching to custodial review to prioritize a small number of remaining documents is less disruptive to speed and accuracy than requiring it so near the beginning.

## H. **Amazon's Review Process Adheres To Standard Practices**

66.     I have reviewed the record relating to the ESI review processes that Amazon has implemented in this case.  Amazon has implemented a robust and proper review process that adheres to industry standards.

67.     First, Amazon engaged a team of approximately 70 contract attorneys as 1LRs to take an initial pass through all of the documents that hit on the government search terms.  As part of this initial review, their first task was to determine if a document was potentially responsive.  To help make sure that the 1LRs did not miss responsive documents while they were still learning the 118 specific requests, merits counsel identified eight topics or "themes" to group requests by subject matter at a high level, such as "worker safety," "injuries," "productivity," and "recordkeeping."  Emphasizing these themes helped call the 1LRs' attention to the most important topics they should look for.  Requiring 1LRs to review only for general relevancy, and not analyze and make judgment calls regarding each of the 118 document requests at issue also streamlined Amazon's review process and greatly reduced the amount of loading and scrolling

on the coding panel that was required at the first stage.  This is consistent with industry standard practice for first level review in a matter with so many disparate subjects to be coded.

68.     1LR attorneys also evaluated each document to determine whether it was privileged, which is consistent with industry standard practice.

69.     Following first-level review, documents identified as relevant were routed to second-level review to assess whether they had been correctly identified as responsive to the government's subpoenas and, if so, to analyze and specify which of the 118 document requests each document was responsive to.

70.     Because responsive documents must be produced with their family members, any family members without search term hits (which had not been included in the first-level review) were included in the second-level review batches so 2LRs could evaluate them for privilege as well.  Reviewing the "full family" together for privilege is a standard practice and, as noted above, required to adhere to basic fiduciary obligations related to the protection of a client's privileged and confidential information.

71.     Amazon is grouping documents for second-level review in order of custodian, consistent with the government's demand, but also according to the theme tag with which they were marked in first-level review.  This approach mitigates some of the inefficiency caused by the custodian approach to review, but only somewhat.

72.     In second-level review, documents coded as non-privileged by the 1LRs were prioritized to expedite production.   Documents identified as privileged by 1LRs were batched separately and initially set aside pending further privilege diligence.  This approach is consistent with industry standards.

73.     Amazon retained a group of more than 50 attorneys from the law firms Gibson Dunn, Jackson Lewis, and Ogletree Deakins to conduct "second-level" review.

74.     As detailed above, in an optimal scenario, 2LRs will typically have greater knowledge of the case than 1LRs.  Here, however, in an attempt to expedite production of documents on the government's demanded timetable, most of the attorneys on this second-level review team had not previously been involved in the case or had limited involvement in it.

75.     In short, trying to push forward on an expedited timetable required first- and second-level review teams far larger than the team of merits counsel working on the investigation, complicating quality control review efforts and significantly increasing the likelihood of bottlenecks in review—especially at the outset of the review—as detailed above. The process implemented was consistent with standard practice where, as here, ESI review is being expedited for prompt production of as many non-privileged documents as possible.

I.   **Amazon's Rate of Review and Production Is Reasonable**

76.     I understand that Amazon's first-level review team completed its initial first-level review of the documents that hit on the government's search terms by December 23, 2022.

77.     I further understand that as of the date of this declaration, Amazon's second-level review team has completed review of approximately 64,800 documents.

78.     These rates of review are consistent with what I would expect in light of the number of attorneys involved at each level of the review, the complexity of the review, the large number of requests each document is being evaluated against, and the short timeframe between commencement of review and the first production.

79.     I understand that, as of the date of this declaration, Amazon will have produced approximately 9,700 documents with at least one family member that hit on the government's

search terms.  This is also consistent with what I would expect in light of the number of attorneys involved, the complexity of review, and the short timeframe between commencement of review and the first production, requiring additional quality control efforts by merits counsel.  For the reasons discussed above, the rate of production with this (as any other ESI review) increases as efficiencies are reached based on quality control review and ongoing training efforts.

80.     In my experience, it is not reasonable to suggest that Amazon is not already spending enough time or resources on its review. As explained above, well-managed document reviews require that reviewers gain expertise by following detailed protocols developed and implemented by a pool of experienced attorneys who also provide training, oversight, and quality control efforts.  These needs cannot be circumvented simply by further scaling up the review team, and in fact adding too many new reviewers too fast can be counterproductive, as growing numbers of inexperienced reviewers generate more and more inaccurately coded documents, overwhelming the ability of merits counsel to complete quality control before productions are made.

81.     Indeed, in my experience, Amazon's review here bears many hallmarks of a review that is difficult to scale at all, much less in a matter of weeks.  This is due to the large number of individual document requests that must be evaluated and labeled; issues that require custodians to regularly seek advice from or act at the direction of attorneys as described below; issues that involve trade secrets and other highly sensitive information as described below; a production schedule that diverted merits counsel to quality control without leaving time to pass on feedback; a deposition schedule that prematurely required abandoning more effective batching techniques like topical review in favor of custodial batching; and merits counsel who

were occupied with depositions and other discovery tasks necessitated by the government's demands.

82.     The government's briefing cites an average document review rate of 40 to 100 documents per hour to argue that Amazon's productions to date have been insufficient.  In my experience, however, such averages are generally unhelpful when judging any particular document review, much less a single phase of a review.  Averages smooth out variability over time; for example, a document review with an average rate of 50 documents per hour could have started at 1 document per hour and ended at 100 documents per hour.  And though there is effectively an upper limit on review rate—even a theoretical superhuman reviewer who could read a document and make all decisions instantly is limited by the number of documents the platform can load in an hour—there is no ascertainable bottom limit.  For example, a difficult document that gets escalated through the increasing bottlenecks of 1LR, 2LR, 3LR and going back to the custodian can take days to "review."

83.     In general, I have found in my experience that numbers like review rate, team size, or money spent say little on their own about whether a review is being conducted defensibly, efficiently, accurately, or in compliance with ethical duties.  There is no mathematical formula to plug in the myriad factors of a specific case and spit out the reasonable rate of review or number of reviewers.  Instead, you must look at the actual practices of the review to see how they compare to typical reviews and accepted practices, and how the review has been adapted to meet its case's particular challenges.  A low review rate, particularly early in a review, is thus at worst a signal to investigate the process.

84.     Here, as detailed above, Amazon has implemented a robust ESI review process that is consistent with industry standard practices given the breadth and complexity of review and in light of the government's various demands.

85.     Amazon's review process also attempts to mitigate the particular challenges of this case in order to start getting the government documents quickly in advance of expedited depositions.  In particular, I would highlight the development of thematic first-level review tagging to help prevent inexperienced reviewers from missing relevant documents before they were familiar with all 118 document requests and the use of that thematic tagging to direct batching (within custodians) to help mitigate the inefficiencies caused by the government's demanded custodian approach.  In short, Amazon's process is a reasonable and appropriate way to address these issues and ensure that the ESI review is defensible.

86.     I also find it important to point out Amazon's retention of law firm attorneys to increase the review pool for second-level review, rather than retaining more contract attorneys.  When the demands of a document review outpace merit counsel's ability to handle it alone, it is common practice to hire contract attorneys, who are typically both less costly and more readily available than full-time attorneys at law firms.  Amazon could defensibly have done so, yet went to the extraordinary effort and burden of engaging 50 attorneys from three different of its outside counsel firms, equating to over 40% of the entire pool of new reviewers.  In my experience, this demonstrates a good faith effort to comply with the government's requests without sacrificing defensibility or ethical obligations.

87.     From my review of the relevant correspondence in the briefing record, I also understand that the government has suggested Amazon can complete its review in an expedited way by reviewing documents that hit on a search term just once and producing those documents

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

(and their families) based only on a contract attorney's initial assessment and without reviewing family members at all.  This approach is not sound.  In fact, this approach not only violates many of the standard practices I have described, but would also represent a breach of the fiduciary and ethical duties Amazon's attorneys have to protect their client's privileged information and confidential trade secrets.

88.     Notably, I understand these documents were taken from the files of high-level executives at one of the country's largest companies; they are likely to contain sensitive competitive information over which Amazon loses significant control following production to the government.  In addition, as discussed below, many of the privilege determinations being made in this case are complex and time-consuming, and it would be irresponsible to leave them in the hands of reviewers with little training and experience or involvement in the case.

### J.  <u>Amazon's Privilege Review Process Is Reasonable And Consistent With Industry Standard Practice</u>

89.     The government has objected to the fact that Amazon has not yet provided a privilege log or produced documents that were identified as potentially privileged by attorneys during the first and second level review process.

90.     Particularly where depositions are quickly approaching, it is common practice for parties to complete review of and produce all documents that were not flagged as privileged by reviewers before completing a full privilege review or logging the rest.  As described above, prioritizing review and production of non-privileged documents is a common practice when rolling productions are being used to get documents to a requesting party faster.  Because a licensed attorney has determined in review that the delayed documents are likely privileged, it is unlikely that the majority of them will ultimately be produced, and it does not make sense to delay the production of responsive, non-privileged documents while this is confirmed.  This is

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

especially true because privilege review is more time consuming than responsiveness review, particularly when it requires client follow-up to determine whether attorneys were involved in an email chain for purposes of providing legal advice or whether a document with a privileged header but no other indicia of privilege was actually prepared at the direction of attorneys.  There is no need to delay the production of responsive, non-privileged documents in the meantime.

91.     As detailed above, the process of creating privilege logs is also time-consuming. In cases where parties are making rolling productions in advance of depositions, it is standard practice to devote resources to production of non-privileged documents and reserve privilege diligence, review, and logging for the final step in the ESI review process.

**K.  <u>Conclusion</u>**

92.     Based on all the factors described above and in my experience handling and/or reviewing thousands of ESI reviews during my career, Amazon's request that it be afforded through June 30, 2023 to complete its review of documents, produce all responsive non-privileged documents, and provide privilege logs describing all withheld documents, is reasonable and based on an approach that is consistent with standard practices.

\* \* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 18, 2023
Durango, Colorado

By: _____

Mollie C. Nichols

DECLARATION OF MOLLIE NICHOLS
(CASE NO. 2:22-CV-01815-JCC)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104

# Curriculum Vitae
# Mollie C. Nichols

Name:               Mollie C. Nichols
Address:            Redgrave Strategic Data Solutions
                    4800 Westfields Blvd, Suite 250
                    Chantilly, VA 20151
Telephone:          202.297.7040
E-mail:             mollie.nichols@redgravedata.com

## Professional Experience

### 2022 – present   Redgrave Strategic Data Solutions, Chief Executive Officer

As the CEO of Redgrave Strategic Data Solutions LLC ("Redgrave Data"), a legal technology services company, Ms. Nichols is a mission-driven, collaborative, and visionary leader of the organization guiding a team of legal, technology, data professionals to produce data driven solutions that efficiently manage and analyze litigation, investigations, and deal data. She drives the strategic relationships with Redgrave LLP, clients, and service providers, and oversees the development of the team's approach to the search and analysis of client data in matters using advanced technologies, including machine learning, data visualization, and advanced analytics.

### 2018 - 2022   Hogan Lovells US LLP, Head of Advanced Client Data Solutions

Hogan Lovells is the 9th largest law firm by revenue globally with over 2800 attorneys in 47 offices worldwide.  Ms. Nichols is responsible for developing the firm's global approach to the analysis of client data in matters using advanced analytics and machine learning technologies to enhance efficiency and effectiveness through process and project management.  She is a part of the Global Business Leadership Team and the firm's Legal Technology Working Group comprised of partners and business leaders worldwide. She oversees both the technical staff and Discovery Attorneys who work on matters involving eDiscovery and is responsible for the business model for providing technology assisted review services to all attorneys in the firm globally.  She has advised law firms and multinational corporations on legal strategies regarding the preservation, collection, search, analysis and production of electronic information for litigation and regulatory matters.  She is also responsible for the global business model to provide technology assisted review services through a managed service provider to all 47 offices and to develop internal bespoke solutions assisting with client data.

### 2016 – 2018   Cleary, Gottlieb, Steen & Hamilton, Senior Attorney

Cleary Gottlieb is a leading international law firm with more than 1,200 lawyers in 16 offices located around the world. Ms. Nichols oversaw the Discovery and Litigation Technology group that includes 50 lawyers and 5 litigation technologists to provide

innovative eDiscovery services and counsel to the firm's global clients using advanced technologies and efficient, defensible processes.

Ms. Nichols managed the business of the Discovery group, including risk reduction, profitability, and revenue generation exceeding $45M per year, as well as provided legal advice and counsel to clients on issues regarding cross-border discovery, data privacy, and eDiscovery strategy in litigation and regulatory matters.  Representative work includes:

<u>Business Management</u>

- Directing large-scale data remediation efforts, saving over $350,000 in the first 18 months of effort

- Standardizing process and documentation for the use of advanced analytic technologies in all matters

- Establishing software as a service model for the use of advanced technology

- Advancing knowledge management and training program

- Maximizing profitability by reducing costs and fee write-offs (identifying over $200K of nonessential costs that can be eliminated)

- Enhancing revenue by expanding services to non-litigation practice areas

- Capturing metrics to use for cost project and budgeting for future matters

<u>eDiscovery Counsel</u>

- Advising clients on cross-border eDiscovery issues in litigation and regulatory matters, including data privacy and transfers

- Developing strategies using advanced technologies to analyze data in global cartel investigations

- Developing strategic technology assisted review protocols in complex regulatory investigations

- Developing preservation strategies for global merger investigations and litigation

- Strategic use of quick peek agreements and clawbacks

## 2012 – 2016  Redgrave LLP, Partner

Redgrave LLP, a law firm focusing on Information Law, addresses complex legal challenges that arise at the intersection of law and technology, including eDiscovery, information governance, data privacy, and data security.  The firm has four primary

offices in Washington, DC, Northern Virginia, San Francisco, and Minneapolis.  Ms. Nichols was a partner and served on the firm's Management Committee.

Ms. Nichols represented Fortune 100 and 200 clients providing advice and counsel regarding the legal complexities of electronically stored information during day-to-day business operations, as well as throughout the litigation process, including:

eDiscovery
- Representing clients in contentious, high-stakes litigation with respect to electronic discovery legal issues and strategy

- Managing cross-border data transfers for litigation

- Developing litigation readiness plans, processes, and policies for multinational clients

Information Governance and Data Security

- Assessing and managing legal and compliance risk regarding data management and retention

- Developing data security policies and processes

- Providing data security legal assessments

- Developing policy, process, and technology solutions for information governance

- Assessing and providing legal advice on the retention and disposal of legacy data

- Developing policies for mobile devices and social media, and other emerging technologies

- Proactively working with analytics and other advanced technologies to assist with information governance

**2007 – 2012   Goodwin Procter LLP, Director of eDiscovery and Litigation Services**

Goodwin Procter LLP, is one of the nation's leading law firms with more than 850 attorneys in three countries.  Ms. Nichols' responsibilities included directing the firm's eDiscovery and litigation services groups.  She sat on the firm's Technology, Information Management, and Alternative Billing Strategies Committees, and was chair of the firm's Risk Management Task Force.  She also advised the firm and its domestic and multinational clients on compliance issues arising in an eDiscovery context from US data privacy regulations and EU Directives.  She directed a staff of 45 eDiscovery attorneys, litigation technology specialists, and other legal professionals in multiple offices.

As a risk manager, Ms. Nichols assessed internal firm risk and refined its process for implementing litigation holds and responding to subpoenas; developed security plans for protecting client information while in firm's possession; developed security and oversight

plans for overseas document reviews; developed legally defensible data disposition protocols, developed processes to track and audit eDiscovery projects; standardized processes and naming conventions for consistency and efficiency throughout the firm; completed due diligence for selection of Legal Process Outsourcing and SaaS providers; worked with the firm's Management Committee, Executive Committee and CIO for strategic development and implementation of change within the firm.  She also managed vendor relations by selecting appropriate vendors, by negotiating master services agreements and by monitoring quality of service.

Ms. Nichols addressed the business needs of the firm and its clients by managing costs of eDiscovery and other litigation services through creative arrangements with preferred service providers, enhanced processes and the use of internal technology tools.

**2006 – 2007   First Advantage Litigation Consulting, Senior VP and Counsel**

First Advantage is a sophisticated multi-disciplinary firm specializing in electronic discovery consulting, electronic discovery processing, computer forensic investigation and data recovery.

Ms. Nichols advised lawyers, law firms, and multinational corporations on legal strategies in the preservation, collection, and production of electronic information during the litigation process, as well as, the review and production of documents in the EU for cartel and FCPA investigations.   She regularly conducted worldwide IT and key player custodial interviews to develop a preservation and collection plan.  She also advised corporations how to prepare for litigation through development of appropriate document retention programs and implementation of litigation holds.

**2003 – 2006  William & Mary School of Law, Courtroom 21, Associate Director for Research and Professional Education and Adjunct Professor of Law**

Courtroom 21 Project is an international demonstration and experimental courtroom technology project that includes the world's most technologically advanced trial and appellate courtroom.  It is located at William & Mary School of Law.

Ms. Nichols worked with and trained lawyers and judges world-wide on the use of technology in a litigation practice, including electronic discovery, trial, and appellate issues utilizing resources from the Courtroom 21 Project.  She also designed and supervised Courtroom 21 court technology training programs. As an Adjunct Professor, she taught Technology-Augmented Trial Advocacy, Legal Technology, and Digital Discovery & Evidence.  In February 2004, as a result of her expertise with digital evidence, she was invited to and participated in a group discussion with the Advisory Committee to the Judicial Conference at Fordham Law School about yet-to-be published proposed amendments to the Federal Rules of Civil Procedure to incorporate the nuances of electronically stored information that eventually went into effect December 2006.  She supervised and participated in the Courtroom 21 Special Master program for discovery disputes involving electronically created and stored evidence.

**2002 – 2003  University of Texas School of Law and Graduate School of Business, Adjunct Professor**

Ms. Nichols taught a course that focused on the legal issues pertaining to the protection and security of information systems. She also developed and taught an innovative multi-disciplinary course to MBA and law students integrating a variety of issues including intellectual property, ethical accounting practices, breach of contract, employment practices, and divorce.

**1999 – 2003  Office of the Attorney General-State of Texas,  Special Assistant Attorney General and Director of Litigation Training**

Ms Nichols established and ran a trial training program for 640 attorneys covering civil, criminal, and appellate advocacy; emphasized the use of technology in litigation including electronic discovery, case and document management, and courtroom technology.  She made recommendations to Attorney General on policy issues.  She litigated, managed, and consulted on special cases assigned by the Attorney General, including large document consumer fraud cases.

**1994- 1999  Byrd, Davis & Eisenberg, LLP, Austin, Texas**

Ms. Nichols litigated personal injury and wrongful death litigation, including medical malpractice, hospital negligence, products liability, Federal Tort Claims, vehicular negligence, deceptive trade practices, and employment related torts.

**1987 – 1994  Department of Justice, United States Attorney's Office**

*1994  Assistant Director, Office of Legal Education, Washington, D.C,*
Ms. Nichols planned substantive law seminars and supervised the Civil and Appellate Divisions of the Attorney General's Advocacy Institute, the nationwide trial advocacy training program for Assistant United States Attorneys.

*1987 – 1994  Assistant United States Attorney, Western District of Texas*
Ms. Nichols represented the United States, its agents, and its agencies in criminal prosecutions, quasi-criminal asset forfeiture litigation, and in civil litigation. She was responsible for one of the early cases dealing with electronic evidence and alleged violations of the Electronic Communication Privacy Act, including the Federal Wiretap and Stored Communications Acts, a landmark case where computers that contained unopened email were seized by the Secret Service.

**1986 – 1987  The Honorable Walter S. Smith, Jr., Waco, Texas**

Ms. Nichols served as a Law Clerk to United States District Judge Walter S. Smith, Jr.

## Publications and Papers

*The Sedona Conference Commentary on Information Governance, Second Edition,* co-author (April 2019)

*InfoGov: Not Just Another Pretty Buzzword,* American Lawyer Media's Legaltech News (June 2015)

*The Use of Special Masters: Legal Considerations in Using Special Masters in an Electronic Discovery Dispute,* American Lawyer Media's e-Discovery Supplement (Fall 2004)

*Electronic Filing:  A Legal and Social Challenge*, The Maritime Law Association of the United States, New York City (May 2004)

*The Electronic Courtroom and the Use of Demonstrative Exhibits*, Suing and Defending Governmental Entities, State Bar of Texas (July 2003, 2004)

*Technology and the Law: Persuasive Presentations*, The Jury Trial Seminar, University of Texas (September 2002 and January 2003)

*A Tale of the Crypt: The United States as a Follower in the Global Development of Encryption Policy - Should it Step Back Up to the Plate?,* University of Texas School of Law, LLM Thesis (2002)


## Speaking Engagements

*The De-Commoditizing of Data in the Legal Industry,* 3 Geeks and a Law Blog, 2022

*Compliance into the 2020s and Beyond*, Innovation in Compliance podcast, 2022

*How to Make a Decision Based on Data?,* Mexican Bar Association, 2022

Interview: ACEDS' #eDiscoveryLeadersLive with George Socha*,* 2022

*The Future of Legaltech*, Greenhouse Client Event, Hogan Lovells, 2021

*You can't handle the truth! (or can you?): Understanding AI's Boundaries,* LawIT Legal Summit, 2021

*Adapting to new technology within your firm,* LexisNexis Webinars, 2020

*Technology and Law: Disruptions to Practice Abound,* Mexican Bar Association, Mexico City 2020

*Updated Guidance from The Sedona Conference on Information Management, Compliance With Privacy Requirements and Disposition Issues,* ARMA, Nashville 2019

*GDPR: Preservation and Processing: Managing EU Personal Data for U.S. Discovery,* Georgetown Law's Advanced eDiscovery Institute, Washington, DC, 2018

*Innovation in eDiscovery,* Sandpiper Partners events, New York, 2017
*Cost-Effective Strategies for Fulfilling your e-Discovery Obligations,* DC Bar, Washington, DC, 2017

*Managing Data from the EU During Litigation,* ILTACON, Las Vegas, 2017

*Controlling Litigation Costs – Managing Your Legal Department for Success,* Bloomberg Law Panel Presentation, Chicago, 2017

*TAR for Smart People,* Catalyst Seminar and Panel Discussion, Pittsburgh, PA, 2016

*Information Governance, Data Security, eDiscovery, & Data Privacy,* ARMA, Washington, DC, 2015

*Using Analytics to Enhance Litigation and Discovery Strategy,* LegalTech, New York City, 2015

*How Technology Can Help Control Litigation Costs*, GOAL's Global Litigation Conference and Exhibition, New York, 2014

*Data Preservation in the Face of Evolving Rules,* Chicago Symposium on Preservation Excellence, Chicago, IL, 2014

Faculty/Coach, The eDiscovery Training Academy, Georgetown Law Continuing Legal Education, Washington, DC, 2014

Guest Lecturer, American University Law School, Washington, DC 2014

*Predictive Coding Pessimists and Promoters,* Technology in the Law Symposium, Washington, DC, 2013

*eDiscovery Challenges*, Redgrave LLP Corporate Roundtable, Chicago, 2013

*E-Discovery: Reality Checkpoints — Identifying Litigation-Critical Discovery Junctures Early in Your Case,* LexisNexis webinar, 2012

*Privacy Laws: How Encrypted Does Your Data REALLY Have to Be?,* ILTA, Washington, DC, 2012

*Managing Risk in Practice Support Departments,* ILTA, Washington, DC, 2012

*Hot Topics in E-Discovery:  Technology Assisted Review and Social Media,* Suffolk Law School, 2012

*Legal Hold and Data Preservation Best Practices,* Legal Hold Pro Forum, Portland, 2012

*Management Principles & the "Business of Practice Support,"* Georgetown Law program for Practice Support Professionals, 2011

*Legal Process Outsourcing 2.0: Opportunities and Challenges*, Consero Legal Technology Forum, San Diego, 2011

*Risk Management in eDiscovery and Practice Support*, Consero Legal Technology Forum, San Diego, 2011

*E-Discovery Technology Primer,* Georgetown Law program for the Federal Election Commission, Washington, DC, 2010

*The Training of E-Discovery Practice Support Professionals,* Georgetown Law's E-Discovery Practice Support Forum, Washington, DC, 2010

*E-Discovery and Cost Savings: Keep those Rising E-Discovery Costs in Check*, LegalTech West Coast, Los Angeles, 2010

*Reducing Costs While Acquiring and Keeping the Technology You Need,* LegalTech, New York City, 2010

*eDiscovery Update*, AIPLA 2008 Spring Meeting, Houston, 2008

Topics presented to law firms in 2006 and 2007:
- *Legal and Technical Challenges of a Litigation Hold*
- *Using Rule 30(b)(6) to Find All Relevant Electronic Data*
- *The Amended Federal Rules:  Will Litigation Practice be Different?*
- *Offensive and Defensive eDiscovery Tactics*
- *Forensic Experts: Do I need one?*
- *E-mail:  The New Smoking Gun*

*Leading Through the Electronic Discovery Quagmire (Part 2): Current Case Law & Practical Considerations,* ACC Annual meeting, San Diego, 2006

*The Use of Special Masters in Electronic Discovery Disputes,* 9th Court Technology Conference, Seattle, 2005

*ADR & Technology:  An Introduction to the Cutting Edge*, ABA Public Contract Law Section, Washington, DC, 2005

*Electronic Discovery and Digital Evidence Institute*, State Bar of Texas, Houston, 2005

*Preservation of Digital Evidence*, Widener School of Law, Wilmington, DE, 2005

*Persuasive Courtroom Presentation Technology*, Courtroom 21, Williamsburg, VA, 2004, 2005

*Courtroom Technology:  A Survey Course for Litigators*, United States Small Business Administration, Washington, D.C., 2004

*The Harsh Reality of E-Discovery:  Essential Steps to Protect Your Company*, Armstrong Teasdale In-House Counsel e-Discovery Seminar, St. Louis, 2004

*Electronic Discovery and Evidence*, The Bar Association of Metropolitan St. Louis, 2004

*Electronic Filing:  A Legal and Social Challenge*, Maritime Law Association, New York City, 2004

*Privilege Waiver in Electronic Discovery,* Widener School of Law, Wilmington,  2004

*Electronic Filing and Courtroom Technology,* Cybercourt Symposium*,* Toin University of Yokohama, Japan, 2003

*Procedural and Evidentiary Considerations for Judges,* 8th Court Technology Conference, Kansas City, 2003

*The Electronic Courtroom*, State Bar of Texas CLE, 2003, 2004

*Courtroom Technology,* Travis County Bar Association, Austin, TX, 2003

*Technology and the Law: Persuasive Presentations,* Jury Trial Seminar, University of Texas School of Law CLE*,* 2003


## Awards

Financial Times, Most Innovative Law Firm in North America for the Business of Law (Hogan Lovells), 2021
Financial Times, Top 5 Innovative Change Maker for Law Firms in North America, 2021

## Licenses and Certifications

State of Texas
District of Columbia
United States Court of Appeals for the Fifth Circuit
United States Supreme Court

## Memberships

Chief
The Sedona Conference, WG1, WG6, WG11
The Sedona Conference, WG1 Sub-Committee on Information Governance
IAPP

## Education

**THE UNIVERSITY OF TEXAS at AUSTIN**

*LL.M. in International Law, 2002*

*Doctor of Jurisprudence, 1986*
- Edited *The Review of Litigation*
- Served as Law Intern to The Honorable James R. Nowlin, United States District Judge

*Bachelor of Arts in Psychology, 1983*
- Listed in *Who's Who in American Universities and Colleges* and the *National Register of Outstanding College Graduates*
- Selected as a University of Texas Outstanding Student
- President, Omicron Delta Kappa
- Chair, Texas Union Board of Directors

## Other Professional Education

Collège International de Cannes, Cannes, France,  2002
IS Aix-en-Provence, Aix-en-Provence, France,  2002
Language Studies Canada, Montreal, Canada, 2001 & 2002